UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:   Jimmie Thad Stuteville

Debtor.                                                    Case No.: 19-11085-13j

### Memorandum Opinion on Confirmation of Debtor's
### Second Amended Plan and Creditor Judith Holcomb's Motion to Dismiss or Convert

The question before the Court is whether to confirm Debtor's Second Amended Plan of Reorganization (Doc. 64) (the "Plan") or to grant creditor Judith Holcomb's Motion to Dismiss or Convert Debtor's Case to a Case under Chapter 7 (Doc. 75) (the "Motion to Dismiss or Convert"). In addition to filing the Motion to Dismiss or Convert, Ms. Holcomb filed an objection to confirmation of the Plan (the "Objection"). The Court held a final evidentiary hearing on August 11, 2020. The Debtor, Jimmie Stuteville, and Ms. Holcomb testified. Mark Anthony Filosa, an attorney who represented Ms. Holcomb in state court divorce and custody proceedings also testified. After consideration of the evidence and testimony admitted at the final hearing and being otherwise sufficiently informed, the Court concludes the Plan should be confirmed, subject to some changes stated below, and the Motion to Dismiss should be denied.

### FINDINGS OF FACT[1]

## I.      Divorce and Custody Proceedings

Mr. Stuteville and Ms. Holcomb were divorced in 2015 after approximately eleven years of marriage. Mr. Stuteville and Ms. Holcomb have one minor child ("Child") who turned 15 in September 2020. During the divorce proceedings and continuing to the present, the parties have

---

[1]  *See* Fed. R. Bankr. P. 7052(a)(1) (made applicable by Fed. R. Bankr. P. 3015 and 9014). Findings of fact contained in the discussion section of this opinion are incorporated by this reference in the findings of fact section.

engaged in contentious litigation over custody of Child, as well as child support, reunification counseling, and educational, religious, and other parenting decisions related to Child.

Currently, by order of the State Domestic Relations Court, Mr. Stuteville and Ms. Holcomb have joint legal custody of Child, although Mr. Stuteville has physical custody of Child. Child and Mr. Stuteville live in Magdalena, New Mexico.

Ms. Holcomb last saw Child in 2014. The State Domestic Relations Court prohibited visits between Ms. Holcomb and Child until visits are permitted by court order upon recommendation by a reunification counselor. The State Domestic Relations Court also ordered reunification counseling for Child. Mr. Stuteville drives Child to Albuquerque for counseling sessions. By agreement of Mr. Stuteville and Ms. Holcomb before the State Domestic Relations Court in February 2020, Child also receives reunification counseling in Socorro at Roots Counseling. Counseling sessions at Roots Counseling began in March 2020. At that time, Ms. Holcomb became aware that Roots Counseling may require a deposit, but not the deposit amount. Ms. Holcomb was first notified of a $1,500 deposit required by Roots Counseling on August 10, 2020, the day before the final hearing, and Mr. Stuteville became aware of the deposit requirement just before the final hearing on August 11, 2020. The State Domestic Relations Court has not ruled on if or how the cost of reunification counseling at Roots Counseling should be divided between Mr. Stuteville and Ms. Holcomb.

Mr. Stuteville and Ms. Holcomb stipulated in connection with the divorce proceeding that Ms. Holcomb would pay $400 per month in child support starting December 1, 2019.[2] In addition, Ms. Holcomb agreed to pay $80 per month toward her child support arrearage of $6,000. The State Domestic Relations Court adopted the parties' stipulations as an order of the

---

[2]  Dtr Exh. H. At the final hearing, the Court overruled Ms. Holcomb's objection to Exhibit H but the Court did not admit the exhibit. The Court hereby admits Exhibit H into evidence.

court (the "Child Support Order"). Payments of $480 per month from December 2019 to July 2020 would total $3,840. Ms. Holcomb testified that she has met all child-support obligations with payments to the Child Support Enforcement Division ("CSED"). However, Mr. Stuteville testified that, as of August 11, 2020, he has received only $1,940 from CSED.

In addition to child support payments, the Child Support Order requires Ms. Holcomb to provide medical and dental insurance for Child and to pay 59% of all "reasonable medical and dental expenses not paid by insurance." Moreover, the Child Support Order requires Ms. Holcomb to continue payments of $480 per month "until the last child[3] to emancipate has graduated from high school, if that child is emancipated only by age, is under nineteen and is attending high school or until all children are otherwise emancipated" and provides that, after Child's graduation or emancipation, Ms. Holcomb must continue to pay $480 per month until the $6,000 child support arrearage is paid in full.

Mr. Stuteville suffers from a condition known as "essential tremor." Because the condition can be hereditary, Child was assessed by a neurologist for essential tremor when he was three or four years old. No recommendations were made at that time. Child has no current symptoms of that disorder or any other physical medical disorder requiring treatment.

Child began the 2020-21 school year in eighth grade in Socorro after completing two years in seventh grade in Magdalena. Mr. Stuteville drives Child to school in Socorro, which is 24 miles east of Magdalena.

## II. Child's Social Security Benefits

Child is entitled to Social Security benefits as long as he is in school or until he is 19 years and 3 months old. Mr. Stuteville is the representative payee for Child's Social Security

---

[3] Child is the only child to which the Child Support Order pertains.

benefits. He does not receive a payment for being Child's representative payee. Currently, Child is 15 years old and in the eighth grade; he will be 19 years and 3 months old in December 2024 and is scheduled to complete high school in 2025. Both dates are after expiration of the term of the Plan, as discussed below.

Mr. Stuteville relies on the Social Security Administration's Guide for Representative Payees (the "Guide") to understand how to manage Child's Social Security benefits. The Guide states that a representative payee, such as Mr. Stuteville, must "take care of the beneficiary's day-to-day needs for food and shelter[,] . . . use the money for the beneficiary's medical and dental care that's not covered by health insurance [and] . . . pay for the beneficiary's personal needs, such as clothing and recreation."[4] It further provides that a payee "must save any money left after [the payee] pay[s] for the beneficiary's needs, preferably in U.S. Savings Bonds or an interest-paying bank account, insured under either federal or state law."[5] A representative payee must repay any misused funds and may be fined and imprisoned if funds are misused. Mr. Stuteville understands that the Social Security benefits for Child are to be used for Child's benefit only.

In the State Domestic Relations Court proceeding, Ms. Holcomb moved "to prevent [Mr. Stuteville] from using all [Child's] Social Security income to fund his bankruptcy plan," among other things.[6] In its order resulting from a hearing on the motion, the State Domestic Relations Court found that "[Child] received approximately $1,100 [per month] in Social Security Benefits

---

[4] *Id.*
[5] *Id.*
[6] Holcomb Exh. 12.

which is intended for [Child]'s support and only [Child]'s support."[7] It further stated, "This Court will leave it to the [b]ankruptcy [c]ourt in its discretion to enforce this provision."[8]

## III.    Debtor's Bankruptcy Case

On May 6, 2019, Mr. Stuteville filed a voluntary petition under chapter 13 of the Bankruptcy Code, initiating the present bankruptcy case. Mr. Stuteville has not filed for bankruptcy protection before. Ms. Holcomb filed four proofs of claim[9]:

1.    Claim No. 8-1: unsecured, non-priority claim for $750,000 for a personal injury action filed in 2016 in the Seventh Judicial District Court in Socorro County (currently pending);
2.    Claim No. 9-1: unsecured, non-priority claim for $16,000 related to a personal property settlement in the divorce;
3.    Claim No. 10-1, as amended by Claim 10-2: unsecured, priority claim for $1,000 and unsecured, priority domestic support obligation of $10,000 related to guardian ad litem fees incurred in the state domestic relations court[10]; and
4.    Claim No. 11-1: unsecured, non-priority claim for $4,000 for sanctions against Mr. Stuteville in the divorce proceedings.[11]

## IV.    Debtor's Plan and Amended Schedules I and J

### A.    Debtor's Income and Expenses

Mr. Stuteville is retired and has no personal income other than Social Security and retirement income. He also receives child support and Child's Social Security benefits as discussed above. He lives in Magdalena, New Mexico in a home he purchased four years ago. The home is mortgaged to Bank of America, which filed a proof of claim in the amount of $177,859.59. Mr. Stuteville also owns a 2014 Ford F250 SuperDuty diesel four-wheel-drive

---

[7]  *Id.*
[8]  *Id.*
[9]  The Court took judicial notice of the fact that these claims were filed.
[10]  The Court overruled Debtor's objection to Ms. Holcomb's Claim 10-2 in part in an order entered on November 27, 2019. The Court allowed $10,000 of the claim as an unsecured priority domestic support obligation claim and $1,000 of the claim as an unsecured non-priority claim. Doc. 59.
[11]  After Debtor filed an objection to Ms. Holcomb's Claim 11-1, Ms. Holcomb withdrew her assertion of priority status of Claim 11-1. The Court subsequently entered a stipulated order allowing the claim as a non-priority unsecured claim. Doc. 101.

truck (the "Truck"), which he bought used in 2015, and a 2001 15-passenger van with over 300,000 miles that is currently not running, and which has not been driven for approximately three years. The Truck is security for a loan from Capital One Auto Finance, which filed a proof of claim for $29,409. Mr. Stuteville purchased the Truck so he could transport his daughter and her horses to rodeo competitions. Now, Mr. Stuteville needs the Truck, his only functioning vehicle, to travel 25 to 100 miles between rural Magdalena and Albuquerque or Socorro to take Child to school, activities and appointments. Mr. Stuteville cannot sell the Truck to raise money to make a down payment on a less expensive vehicle because he has no realizable equity in the Truck.

Mr. Stuteville's monthly net income is the difference between (a) Mr. Stuteville's monthly income of $4,257 (which includes child support, Child's Social Security benefits, and other income less payroll deductions)[12] reported in Amended Schedule I and (b) Mr. Stuteville's monthly expenses of $3,694, including the Truck payment in the amount of $896.72, reported in Amended Schedule J. Mr. Stuteville's net monthly income available for Mr. Stuteville to make Plan payments after paying expenses reasonably necessary for the maintenance and support of Mr. Stuteville and Child and for post-petition domestic support obligations, if any, as reported in Amended Schedule J, is $563.34.

To determine whether Mr. Stuteville's monthly net income is sufficient for Debtor to make his Plan payments of $1,125,[13] the amount of the Truck payment reported in Amended Schedule J ($896.72 per month) must be added to the reported net monthly income of $563.34 because, under the Plan, the chapter 13 trustee will make the Truck payments from Mr.

---

[12]  Debtor also receives a negligible amount of income from mineral interests (between $5 and $15 per month). In some years Debtor does not receive any income from those interests.

[13]  The monthly Plan payments are $325 for seven months (June 2019 through December 2019) and $1,125 for 51 months thereafter.

Stuteville's Plan payments. After that adjustment is made, Mr. Stuteville's monthly net income as reported in Schedule J, is $1,460, which is $335 more than the amount of the Plan payment.

However, at the final hearing, Mr. Stuteville testified he spends more on certain expenses than shown on Amended Schedule J, as follows.

| Category | Monthly expense as scheduled | Estimated monthly expense per Mr. Stuteville's testimony | Difference |
|---|---|---|---|
| Food and housekeeping supplies | $400 | $600 | $200 |
| Clothing, laundry, dry cleaning | $10 | $150 | $140 |
| Transportation | $450 | $500 | $50 |
| School supplies | | $40 | $40 |
| **TOTAL** | | | $430 |

These higher expense estimates would leave Mr. Stuteville with a monthly shortfall of $95, after accounting for the $1,125 Plan payment.

Mr. Stuteville also testified, however, that he has been making the Plan payment for 15 months ($325 for 7 months (and $1,125 for 8 months) while paying his actual monthly expenses in full and adequately supporting Child. Mr. Stuteville has been able to cover his and Child's basic expenses, as well as provide clothes, equipment, and transportation related to Child's participation in various sports and other activities, while also making the Plan payment. Mr. Stuteville also has been able to pay his portion of the expenses for Child's counseling. Further, Mr. Stuteville's estimated shortfall each month is approximately 2% of his monthly income. Under the circumstances, the Court finds that Mr. Stuteville can manage his expenses in such a manner as to make his monthly Plan payment, pay his other monthly expenses, and adequately care for himself and Child.

### B. Plan Treatment of Claims

Mr. Stuteville's total plan base is $59,650, payable over 58 months, or through March 2024. In the Plan, Mr. Stuteville proposes to pay Bank of America in full directly, although the amount in arrears as of the Petition date ($3,459) is to be paid by the chapter 13 trustee from the Plan payments. All other priority and secured claims will also be paid by the trustee from the Plan payments.

The Plan provides that anticipated administrative claims, to be paid in full, total $8,000. Mr. Stuteville proposes to pay Capital One Auto Finance's claim in full. The amount of that claim is $29,409 plus 6% interest, which, if paid over four years would amount to approximately $34,000 including interest.

In addition, Mr. Stuteville will pay in full Ms. Holcomb's $10,000 domestic support obligation claim (Claim 10-2), as allowed by the Court. The trustee will pay that claim from Plan payments. Estimating the chapter 13 trustee fees at approximately $5,600, the total amount of the priority and secured claims and trustee fees to be paid from the Plan payments is approximately $61,200.

The Plan also provides that "allowed non-priority unsecured claims will be paid, pro rata, from [Plan payment proceeds] remaining after disbursements have been made on account of all other claims provided for in this plan."[14] The total amount of non-priority unsecured claims is $69,844, excluding Ms. Holcomb's unliquidated, disputed claim of $750,000. That unliquidated, disputed claim is based on Ms. Holcomb' personal injury claim against Mr. Stuteville pending in the state court.

---

[14]  Dtr Exh. B.

To date, Mr. Stuteville has made all payments required by the Plan through monthly automatic withdrawals from his bank account. He has not borrowed money or been unable to pay his expenses since filing his bankruptcy petition. On the other hand, at the time of the final hearing, Mr. Stuteville's tremors, which may be controlled by a battery-operated device that Mr. Stuteville had surgically implanted in 2010, were not controlled because the device's batteries were not working. Mr. Stuteville had not replaced the batteries because he did not have the resources to do so, although Mr. Stuteville admitted that he had not determined the cost to replace the batteries.

## DISCUSSION

Ms. Holcomb asserts in the Objection that the Plan should not be confirmed because it is not feasible, see 11 U.S.C. § 1325(a)(6),[15] and it was not proposed in good faith, see § 1325(a)(3).[16] In the Motion to Dismiss or Convert, Ms. Holcomb also argues that Mr. Stuteville's case should be dismissed or converted to a case under chapter 7 because the Plan is not feasible.[17]

---

[15]  All future references to "Code," "Section," and "§" are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated.

[16]  Ms. Holcomb also argued that the Plan is not confirmable because it does not properly account for Ms. Holcomb's claim for the $10,000 domestic support obligation (Claim 10-2) which this Court found was an unsecured priority claim. See § 1325(a)(8). Debtor admitted at the final hearing that the Plan did not correctly treat Claim 10-2.

[17]  In the Objection and the Motion to Dismiss or Convert, Ms. Holcomb also asserts that the Plan cannot be confirmed because it does not provide for payment of costs associated with reunification counseling for Child as required by an order of the state domestic relations court. However, Ms. Holcomb subsequently filed a notice of errata on February 28, 2020, stating that "payment for the reunification counseling is a matter subject to dispute before [the state court], and that no order clearly requiring the Debtor to pay for a share of that counseling has been entered, pending issuance of a transcript of the hearing discussing the counseling and resolution of a forthcoming motion for clarification regarding payment for said counseling." Doc. 82. Thus, Ms. Holcomb's argument related to the payment of the counseling fees has been withdrawn at this time.

# I.    Debtor's Plan is Feasible

Under § 1325(a)(6), a court may confirm a plan only if "the debtor will be able to make all payments under the plan and to comply with the plan." Assessment of the feasibility of Mr. Stuteville's Plan requires the Court to examine Mr. Stuteville's income and expenses.[18] "[W]here a debtor cannot make the payments proposed under a [c]hapter 13 plan because his or her net disposable income is insufficient or the expenses unrealistic, the plan is not feasible and cannot be confirmed."[19]

Ms. Holcomb argues that Mr. Stuteville's Plan is not feasible for several reasons. She maintains that Mr. Stuteville improperly counts Child's Social Security benefits as income available to fund the Plan. Ms. Holcomb also argues that, even if Child's benefits are included, Mr. Stuteville's budget is "unreasonably tight [and] does not appropriately provide for [Child's] needs."[20] Finally, she argues that Mr. Stuteville's budget is not feasible because it does not include Mr. Stuteville's costs related to ongoing child custody litigation and Ms. Holcomb's personal injury claim pending in the state court. The Court addresses these arguments in turn.

## A.    Debtor May Include Child's Social Security Benefits in his Income for Purposes of Assessing Plan Feasibility

Ms. Holcomb argues that Mr. Stuteville's inclusion of Child's Social Security benefits in his income used to fund the Plan is contrary to public policy, the Guide, and the State Domestic Relations Court's order, as well as detrimental to Child. The law and the evidence do not support Ms. Holcomb's position.

Generally, "the bankruptcy court must take into account any Social Security income the debtor proposes to rely upon . . . . If the debtor's actual net income, including Social Security

---

[18]   *In re Wark*, 542 B.R. 522, 539 (Bankr. D. Kan. 2015).
[19]   *In re Cordova*, No. 13-07-10950 MS, 2007 WL 2077633, at *2 (Bankr. D.N.M. July 16, 2007).
[20]   Doc. 74.

income, is sufficient to cover all the required payments, the plan is feasible."[21] If Mr. Stuteville appropriately may use Child's Social Security benefits to pay expenses, the Court should consider that source of income to determine whether the Plan is feasible.[22]

The Guide permits Mr. Stuteville to use Child's Social Security benefits to pay for Child's shelter, food, clothing, recreation, and medical needs. Similarly, the State Domestic Relations Court order simply states that Child's benefits are "intended for [Child]'s support and only [Child]'s support." Mr. Stuteville has shown that he understands the requirements of the Guide and uses Child's benefits for Child's expenses consistent with the Guide. Child's benefits are not being used for prohibited purposes. The fact that certain of Mr. Stuteville's expenses— such as those for shelter, utilities, and transportation—benefit both Mr. Stuteville and Child does not mean that Child's benefits are being misused. Mr. Stuteville may use Child's Social Security benefits to pay household expenses that benefit all household members, *i.e.* both Mr. Stuteville and Child.[23] The expenses for shelter, utilities, transportation, food, clothing, recreation and

---

[21] *Mort Ranta v. Gorman*, 721 F.3d 241, 253–54 (4th Cir. 2013); *In re Upton*, 363 B.R. 528, 535 n.3 (Bankr. S.D. Ohio 2007) (stating that "if a debtor's Schedules I and J indicate the net monthly income after excluding any [Social Security income] is less than the proposed plan payment, the [Social Security income] may still be considered by the Court under 11 U.S.C. § 1325(a)(6) to overcome the appearance that the plan is not feasible."); *In re Schanuth*, 342 B.R. 601, 605 (Bankr. W.D. Mo. 2006) (noting that, while the calculation of "current monthly income" does not include Social Security benefits, "there is nothing in the statute that precludes the [d]ebtors from voluntarily devoting a portion of that income to a chapter 13 plan or that prevents the [c]ourt from considering that income in evaluating the feasibility of a plan proposed by the [d]ebtors.").

[22] *See, e.g.*, *In re Damron*, 598 B.R. 350, 355 (Bankr. S.D. Ga. 2019) (noting that the debtor's plan was found to be feasible where the "[d]ebtor voluntarily opted to include his fiance's [Social Security income]" in his budget); *In re Wark*, 542 B.R. at 561–62 (holding that the debtor's plan was feasible based on income from the debtor's employment and her daughter's Social Security benefits).

[23] *See In re Coats*, 214 B.R. 397, 403 (Bankr. N.D. Okla. 1997) (noting that the debtor's expenses were "interrelated" with those of the others in her household); *In re Cornelius*, 195 B.R. 831, 835 n.4 (Bankr. N.D.N.Y. 1995) (superseded by statute on other grounds as noted in *In re Ragos*, 700 F.3d 220, 226 (5th Cir. 2012)) (observing that a child's Social Security benefits were "being spent [by the debtor] in the operation of the [d]ebtor's household for the benefit of herself and her daughter" and that the child's expenses included "a portion of the food costs, household maintenance, clothing, cable, recreation, etc."); *see also* 20 C.F.R. § 404-2040(a) (stating that payments have been used for a beneficiary where they were "used for the beneficiary's . . . food, shelter, clothing, medical care, and personal comfort items").

medical needs that Mr. Stuteville is allowed to pay with Child's Social Security income exceed the amount of that income. Hence, Mr. Stuteville's inclusion of Child's benefits in his income for purposes of assessing plan feasibility is not contrary to the Guide or the State Domestic Relations Court's order.

Nor is such use of Child's Social Security income contrary to public policy. In *In re Hammonds*, the Eleventh Circuit Court of Appeals addressed an objection to a chapter 13 plan similar to Ms. Holcomb's. There, the debtors' sole source of income was from the Aid to Dependent Families with Children[24] ("AFDC") program.[25] "The major goal of the AFDC program [wa]s protection of needy and dependent children by providing them with the 'basic demands of subsistence.'"[26] The state agency administering the AFDC funds objected to the debtors' plan, arguing, in relevant part, that "the AFDC program was designed to benefit dependent children, and not to enable parents to use the AFDC checks as part of their chapter 13 plan."[27] While acknowledging that "the AFDC program was designed primarily to benefit the children," the *Hammonds* Court rejected the agency's argument that "a child is not benefited when his parent uses a portion of the AFDC check to fund a chapter 13 plan."[28] The Court stated, "a chapter 13 plan is not a detrimental use of AFDC funds. Rather, it is another form of budgeting that a parent may elect for the benefit of the family unit. When the family unit is strengthened through the gradual elimination of any debt problems, the needs and desires of the children may, indeed, be satisfied and fulfilled."[29]

---

[24]　AFDC was replaced by the Temporary Assistance to Needy Families (TANF) program by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA). *Kansas v. United States*, 214 F.3d 1196, 1197 (10th Cir. 2000).

[25]　*In re Hammonds*, 729 F.2d 1391, 1392 (11th Cir. 1984).

[26]　*Id*. at 1394 (quoting *Goldberg v. Kelly,* 397 U.S. 254, 265 (1970)).

[27]　*In re Hammonds*, 729 F.2d at 1394.

[28]　*Id.*

[29]　*Id.*

In addition, the *Hammonds* Court identified two methods to ensure that AFDC funds were being used in the best interest of the children. The first was the plan confirmation process itself. "The supervision of the bankruptcy judge, who must insure that the payment plan is feasible given the needs of the individual debtor, is a safeguard against a voluntary chapter 13 plan operating to the detriment of the debtor's children."[30] The second was the state agency's monitoring scheme: "[T]he standard procedures for monitoring the use of AFDC payments are not undermined by allowing a benefits recipient access to chapter 13."[31] Hence, under AFDC, the administering agency could take action to ensure that the funds were used for the intended beneficiaries even when a bankruptcy court had confirmed a plan based in part on the AFDC income.[32]

Similarly, here, the Social Security Guidelines provide for annual reporting of Mr. Stuteville's use of Child's Social Security benefits, as well as the potential review of Mr. Stuteville's records and receipts. They also require repayment of misused funds. *Id*. In addition, because the Bankruptcy Code recognizes the debtors' obligation to provide for their dependents,[33] the Court must, like in *Hammonds*, "consider the debtor's ability to meet the primary obligation to support dependents, because otherwise the plan is unlikely to succeed" and ensure that the "plan . . . not cause the debtor or the debtor's dependents to become a public charge, to the detriment of the debtor, dependents, creditors and the public."[34]

---

[30]   *Id.* at 1395; *In re Howell*, 136 B.R. 120, 122 (Bankr. W.D. Pa. 1991), *aff'd,* 138 B.R. 484 (W.D. Pa. 1992) ("A bankruptcy judge should not confirm [c]hapter 13 plans that work to deprive a debtor and his family from the necessities of life.").

[31]   *In re Hammonds*, 729 F.2d at 1394.

[32]   *Id.*

[33]   *See, e.g.,* § 1325(b)(2) (stating that a debtor's current monthly income is based on the debtor's income "less amounts reasonably necessary to be expended . . . for the maintenance or support of the debtor or a dependent of the debtor").

[34]   8 Collier on Bankruptcy P 1302.03 (16th 2020) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 124 (1978)).

The Court concludes that Mr. Stuteville's use of Child's Social Security income to pay shelter, utilities, transportation, food, clothing, recreation and medical expenses that benefit Child, as contemplated by the Plan, complies with applicable law and the Guide, is not contrary to public policy or the State Domestic Relations Court's order, and is not detrimental to Child. The Court therefore will take that income into account to determine whether the Plan is feasible.

### B. Debtor has Shown that He is Able to Make the Plan Payment

Having concluded that Child's Social Security income should be included to determine whether the Plan is feasible, the Court next examines whether Mr. Stuteville "will be able to make all payments under the [P]lan and to comply with the [P]lan."[35] In assessing feasibility of a plan, "the bankruptcy court should be satisfied that the debtor has the present as well as the future financial capacity to comply with the terms of the plan."[36] This assessment requires a determination that the debtor's income is regular and stable.[37] In addition, the bankruptcy court should determine whether the debtor will have sufficient income to make required plan payments to the chapter 13 trustee while at the same time paying expenses reasonably necessary to support the debtor and the debtor's dependents.[38] Other considerations are whether the debtor is current in plan payments or incurred post-petition debt to cover living expenses.[39] "[T]he proponent of a [c]hapter 13 plan has the burden of proof to show that the § 1325(a) tests have been met."[40]

Here, Mr. Stuteville's income is regular and stable and likely will continue to be so throughout the Plan period. In addition to Mr. Stuteville's retirement and Social Security income, both the child support payments payable to Mr. Stuteville and Child's Social Security income

---

[35]  § 1325(a)(6).
[36]  *In re Wark*, 542 B.R. at 539 (quoting *In re Buccolo*, 397 B.R. 527, 530 (Bankr.D.N.J.2008)).
[37]  *Id.*
[38]  *Id.*
[39]  *Id.*
[40]  *In re Alexander*, 363 B.R. 917, 921 (10th Cir. BAP 2007).

will continue at least until the end of the Plan period. Under the Child Support Order, Ms. Holcomb must continue to pay Mr. Stuteville $480 monthly during the Plan period to pay off child support arrearages she owes Mr. Stuteville. Similarly, neither of the events that would end Child's Social Security benefits will occur until after the Plan period.

In addition, Mr. Stuteville's budget likely will permit him to make Plan payments and cover his and Child's reasonably necessary living expenses. Mr. Stuteville's budget reported on Amended Schedule J shows a monthly surplus, after Mr. Stuteville makes the Plan payment and pays scheduled monthly expenses, of $335. At the final hearing, however, as stated above, Mr. Stuteville testified that some of his monthly expenses are greater than shown on Amended Schedule J. Nevertheless, the Court has found that Mr. Stuteville, who has been making the Plan payments without assistance for 15 months, can manage his expenses in such a manner so as to afford both his Plan payment and his and Child's monthly expenses.[41] While Mr. Stuteville's monthly budget is unquestionably tight, "[d]ebtors who cannot pay their unsecured creditors in full are expected to undergo a moderate amount of belt-tightening in order to ensure the integrity of a [c]hapter 13 plan."[42]

Ms. Holcomb also argues that the Plan is not feasible because Mr. Stuteville's net monthly income after the Plan payment is not enough to create a cushion for unexpected costs related to Child, such as dental care, eyeglasses, or medical care, or for litigation costs associated with child custody proceedings and Ms. Holcomb's personal injury action pending in state court. The testimony regarding Child's potential medical and dental expenses was entirely speculative; there is no evidence that Child will in fact require such care or that Mr. Stuteville will incur

---

[41] *See In re Wark*, 542 B.R. at 540 (stating that the debtor's history of making plan payments suggests the plan budget is "sufficient to allow [the debtor] to maintain normal monthly living expenses").
[42] *In re Loper*, 367 B.R. 660, 665 (Bankr. D. Colo. 2007).

unexpected expenses relating to Child beyond those accounted for in Mr. Stuteville's budget. Excluding speculative potential expenses, Mr. Stuteville has the financial resources to make his Plan payments and adequately care for himself and Child over the life of the Plan. Should concerns about Mr. Stuteville's care of Child arise, recourse may be had in the State Domestic Relations Court.

Finally, no evidence was presented to the Court regarding the status of Ms. Holcomb's personal injury claim against Mr. Stuteville or potential costs Mr. Stuteville will incur associated with future child custody proceedings. The Court has determined that such speculative future costs do not render the Plan infeasible.

### C. Debtor has Shown that the Plan Base is Sufficient if the Plan Period is Extended by Two Months

In addition to assessing Mr. Stuteville's ability to make the Plan payments, the Court also considers whether the Plan base is sufficient to pay holders of priority claims and secured claims as proposed in the Plan. Under the Plan, the trustee will pay from the Plan payments approximately $34,000, including interest, to Capital One Auto Finance for the Truck; $10,000 to Ms. Holcomb to satisfy her domestic support obligation claim; $8,000 to Mr. Stuteville's attorneys for attorney's fees; and $3,459 for mortgage payments in arrears as of the petition date. Including estimated chapter 13 trustee's fees of $5,600, the total amount to be disbursed from Plan payments is approximately $61,200.

Under the current Plan, Mr. Stuteville proposes to make payments of $59,650, which is not enough to pay these obligations. However, if the Plan period is extended to 60 months, Mr. Stuteville will make total payments of $61,900. With this adjustment, the Plan base is enough to pay Mr. Stuteville's obligations to priority and secured claimants under the Plan. The Court,

therefore, will approve the Plan only with this amendment, which can be effectuated in the confirmation order.

Mr. Stuteville has shown that he has been and will be able to make all payments under the Plan; that the Plan base, increased by two additional payments, is enough to comply with the Plan; and that the Plan is feasible. The Court will overrule the Objection and deny the Motion to Dismiss or Convert to the extent they assert that the Plan is not feasible.

## II.  Debtor Proposed the Plan in Good Faith

Ms. Holcomb next argues that Mr. Stuteville's Plan is proposed in bad faith because "[Mr. Stuteville] is paying more than $25,000 for a luxury vehicle at the expense of creditors."[43] Mr. Stuteville's Truck payment of nearly $900 per month is the largest single line item in Mr. Stuteville's budget after the home mortgage payment.

A "primary purpose of the good faith inquiry is to determine under the totality of the circumstances of a case whether there has been an abuse of the provisions, purpose, or spirit of [c]hapter 13."[44] "To determine whether a . . . proposed [c]hapter 13 plan was filed in good faith courts employ a totality-of-the-circumstances test."[45] In doing so, the Court "must consider 'factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code.'"[46] The Court also "keep[s] an eye on the *Flygare*[47]

---

[43]  Doc. 74.
[44]  *In re Knowles*, 501 B.R. 409, 426 (Bankr. D. Kan. 2013) (quoting *In re Sandberg*, 433 B.R. 837, 845 (Bankr. D. Kan. 2010)).
[45]  *In re Rodriguez*, 487 B.R. 275, 282 (Bankr. D.N.M. 2013) (emphasis omitted).
[46]  *In re Cranmer*, 697 F.3d 1314, 1319 (10th Cir. 2012) (quoting *Educ. Assistance Corp. v. Zellner,* 827 F.2d 1222, 1227 (8th Cir.1987)).
[47]  The *Flygare* factors are:
     (1) the amount of the proposed payments and the amount of the debtor's surplus;
     (2) the debtor's employment history, ability to earn and likelihood of future increases in income;
     (3) the probable or expected duration of the plan;

factors that are relevant to each case."[48] Again, "[t]he party who seeks discharge under [c]hapter 13 bears the burden of proving good faith."[49]

Courts have denied confirmation of a chapter 13 plan, as not proposed in good faith, where the debtor proposes to divert income that would otherwise be available to pay unsecured creditors by retaining and continuing to pay for unduly expensive luxury goods that are not reasonably necessary for the support or maintenance of the debtor or the debtor's dependents.[50] This concept equally applies to a debtor continuing to pay for luxury goods in sacrifice of providing adequate support for the debtor's dependents.

Here, under the Plan, unsecured nonpriority creditors will receive little if any distribution, and the Debtor's budget is very tight with little cushion to cover unanticipated expenses. The Court is troubled by the fact that the Truck payment consumes a disproportionate amount of Mr.

---

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;
(5) the extent of preferential treatment between classes of creditors;
(6) the extent to which secured claims are modified;
(7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in [c]hapter 7;
(8) the existence of special circumstances such as inordinate medical expenses;
(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;
(10) the motivation and sincerity of the debtor in seeking [c]hapter 13 relief; and
(11) the burden which the plan's administration would place upon the trustee.

*Flygare v. Boulden*, 709 F.2d 1344, 1347-48 (10th Cir. 1983) (quoting *United States v. Estus (In re Estus),* 695 F.2d 311, 317 (8th Cir.1982)). In *Cranmer*, the Tenth Circuit noted that, while the *Flygare* factors remain pertinent, some of them were subsumed within § 1325(b) after enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984. 697 F.3d at 1319; *see* PL 98–353 (HR 5174), 98 Stat 333.

[48]   *In re Wark*, 542 B.R. at 539.
[49]   *In re Alexander*, 363 B.R. at 922 (quoting *In re Davis,* 239 B.R. 573, 577 (10th Cir. BAP 1999)).
[50]   *See, e.g., In re Loper*, 367 B.R. at 667 (holding that the plan was not in good faith where the debtors proposed a "low percentage of payments to unsecured creditors, coupled with excessively high mortgage payments and an insufficient showing of necessity for such large payments")*; Matter of Jones*, 119 B.R. 996, 1004 (Bankr. N.D. Ind. 1990) (finding that the debtor's plan was not proposed in good faith in part because the debtor proposed to keep an expensive new vehicle and acknowledged that "a dependable used car could be purchased for approximately three thousand dollars"). Section 523(a)(2)(C)(ii)(II) provides in the context of an exception to discharge, that "the term 'luxury goods or services' does not include goods or services reasonably necessary for the support or maintenance of the debtor or a dependent of the debtor."

Stuteville's income, yet Mr. Stuteville has not investigated whether he could obtain a suitable vehicle with lower monthly costs. Nevertheless, the Court concludes that this expense does not by itself warrant denial of confirmation of the Plan on the ground that the Plan was not proposed in good faith. Mr. Stuteville purchased the Truck as a used vehicle in 2015 so he could transport his daughter and her horses to rodeo competitions and has been paying for the Truck for almost five years. Now, Mr. Stuteville needs the Truck, his only functioning vehicle, to travel between Magdalena and Albuquerque or Socorro to take Child to school, activities and appointments. In the Plan, Mr. Stuteville proposes to write down the interest rate on the Truck from 7.46% to 6%. It is not clear that Mr. Stuteville could purchase a suitable vehicle on credit to significantly lower his monthly payment given his inability to make a down payment and his status as a chapter 13 debtor.

In addition, Mr. Stuteville's statement of his income and debts is accurate; there is no evidence that Mr. Stuteville has attempted to mislead the Court; this is Mr. Stuteville's first bankruptcy case; and the Court finds Mr. Stuteville sincere in his efforts to comply with the Bankruptcy Code.

Mr. Stuteville has followed the Bankruptcy Code, pared his budget, and seeks to retain a single six-year-old vehicle.[51] Although the Truck payment is steep, under the circumstances the Court has determined that Mr. Stuteville's retention of the Truck does not constitute an abuse of the provisions, purpose, or spirit of Chapter 13 and is consistent with his proposal of the Plan in good faith. The Court therefore finds and concludes that Mr. Stuteville proposed the Plan in good faith notwithstanding his retention of the Truck.

---

[51] *See In re Roberts*, 493 B.R. at 596 (finding no bad faith in proposing a plan where the debtors "attempted to follow the Bankruptcy Code; [had] pared their expenses and share[d] a single car, . . . and [asked] to keep their house in which they have lived for eight years").

## III.    The Plan Should Be Confirmed

For the reasons set forth above, the Court finds and concludes that the Plan is feasible if the Plan period is extended to 60 months and that Mr. Stuteville has proposed the Plan in good faith and not by any means forbidden by law. The Court finds and concludes further that Mr. Stuteville has complied with the Bankruptcy Code and that, provided Mr. Stuteville modifies the Plan as follows, the Plan meets the requirements for confirmation set forth in § 1325 of the Code. The Plan must be modified to (1) reflect Claim 10-2 as a domestic support obligation in the amount of $10,000 as previously determined by the Court; (2) reflect Claim 11-1 as a non-priority unsecured claim as stipulated by the parties, *see* Doc. 101; and (3) extend the Plan period from 58 to 60 months.

### CONCLUSION

For the foregoing reasons, the Court will overrule Ms. Holcomb's Objection to confirmation of the Plan and deny Ms. Holcomb's Motion to Dismiss or Convert. The Court will enter separate orders consistent with this Memorandum Opinion.

Robert H. Jacobvitz
United States Bankruptcy Judge

Date Entered on Docket: October 29, 2020

Copy To:

Ronald E Holmes
Attorney for Debtor
Davis Miles McGuire Gardner, PLLC
320 Gold SW, Suite 1111
Albuquerque, NM 87102

Daniel Andrew White
Attorney for J. Holcomb
Askew & White, LLC
1122 Central Ave SW, Ste. 1
Albuquerque, NM 87102

Tiffany M. Cornejo
Chapter 13 Trustee
625 Silver Avenue SW
Suite 350
Albuquerque, NM 87102-3111